Filed 11/9/23  In re Aliyah G. CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| In re ALIYAH G., a Person Coming Under the Juvenile Court Law. | B319133 |
| _____ | (Los Angeles County Super. Ct. No. 21CCJP05691A) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Plaintiff, | |
| v. | |
| ANNA G., | |
| Defendant; | |
| ALIYAH G., a Minor, etc., | |
| Appellant; | |
| CHRISTIAN H. et al., | |
| Interveners and Respondents. | |

APPEAL from findings and orders of the Superior Court of Los Angeles County, Nichelle Blackwell, Juvenile Court Referee. Reversed and remanded with directions.

Pamela Rae Tripp, under appointment by the Court of Appeal, for Minor and Appellant.

John L. Dodd, under appointment by the Court of Appeal, for Intervener and Respondent Christian H.

Jesse McGowan, under appointment by the Court of Appeal, for Intervener and Respondent Levi C.

_____

**INTRODUCTION**

Appellant minor Aliyah G. (Aliyah) challenges the juvenile court's March 14, 2022 paternity findings and orders denying her request for a continuance and placing her in the care of her out-of-state biological father Levi C., whom she has never met in person. She contends Christian H., the man who has been her caregiver since birth, should be declared her presumed father, and not Levi C., whom she has met via "a handful of FaceTime calls." Respondents on appeal are Aliyah's biological father Levi C. and alleged father Christian H.

We find the juvenile court erred when it placed Aliyah with Levi C. and denied Aliyah's reasonable request for a continuance. We also reverse the juvenile court's paternity findings and remand with instructions.

2

**FACTUAL AND PROCEDURAL BACKGROUND**

A.    *Events Leading to Filing of Petition*

On October 28, 2021, the family came to the attention of the Los Angeles County Department of Children and Family Services (DCFS) when a caller stated that seven-year-old Aliyah and five-year-old Peyton are "victims of general neglect" by Anna G. (Mother). The caller discussed Mother's "continued alcohol use for the last 4 years" and that law enforcement had been previously called because Mother had "show[ed] up drunk a few times." Mother was charged with driving under the influence in 2019. The caller stated "Father went to get emergency custody" and the court "mandated [M]other not to drink around the children." The children "miss 1–3 days of school a week" because Mother is "sick/throwing up" or sleeps instead of taking them to school; Mother had also forgotten to pick them up from school on prior occasions. The caller also expressed concern that Mother has a history of substance abuse, including methamphetamine, cocaine, and marijuana.

DCFS attempted to investigate by making six unannounced visits throughout November and December, but no one answered the door. DCFS finally made contact on December 2, 2021. Mother appeared "visibly groggy." The children's social worker (CSW) "immediately detected the strong smell of marijuana emitting from the residence" despite the CSW wearing "a surgical grade N95 mask and a 2nd layered protective mask." When asked about the marijuana odor, Mother stated, "Oh really? I can't tell. Well, maybe it's my roommate . . . who smokes." When asked to submit to a same-day on-demand drug screen, Mother declined.

The CSW observed the home to be dirty and in disarray, with large amounts of clutter throughout, including "dried up leftover food, piled dirty dishes, and a large mattress laid across the living room floor." Mother's bedroom was similarly "cluttered and disorderly," and contained a large bed and a "stained mattress" on the floor; Mother indicated she sleeps on the bed and the children sleep on the mattress. The home had working utilities and an adequate supply of food.

Mother is a bartender and confirmed she "often drinks 2–3 beers before returning home from her work shift." She does not drive home from work because her license was suspended as a result of a DUI case in 2019. While at work, her children are cared for by her roommate's 14-year-old son.

Mother was upset over DCFS involvement. She stated that she is in a long-standing custody dispute with father Christian H., who she believed "is attempting to take her children away from her." She stated Christian H. is Peyton's legal father and she declined to provide the CSW with the name of Aliyah's biological father, who is "uninvolved."

A safety plan was implemented and signed by Mother. The safety plan called for Mother to submit to a drug screen on December 3, 2021, clean up her residence, not smoke marijuana near or in the children's presence, and not allow any minor child to supervise her children. Mother called Christian H. in the CSW's presence and informed him of the safety plan. Mother arranged for the children to remain in the temporary care of Christian H., who "readily agreed to pick up" the children.

The CSW went to the children's school and interviewed Aliyah. She denied she is a victim of any physical, sexual, or emotional abuse. However, she confirmed she and Peyton are

often absent from school because Mother "sleeps a lot" and is "very tired." She stated Mother "drinks beers everyday" and smokes "something stinky" inside the home. She confirmed a teenage boy cares for her and Peyton when Mother is at work. Aliyah stated she enjoys visiting with her "stepfather" Christian H. whom she "affectionately refers to as 'dad.'" She enjoys spending time with her stepfather and his wife, who treat her well and take her and Peyton to "a lot of fun places." She denied witnessing any drinking or smoking at Christian H.'s residence.

The CSW interviewed the school's front office secretary, who raised concern about the children's absences, tardies, and unkempt appearance. The school secretary stated she can differentiate when the children are with Mother as opposed to the father because the children are "often forgotten" or picked-up late from school "on [Mother's] days." One teacher commented, "Oh, you can definitely tell when [Aliyah's] been cared for by her father and stepmother. Everything about her changes. She comes to school looking happy, neatly dressed and her hair is nicely combed too. She just seems better cared for in every way. Her homework has been completed too." The teachers expressed relief over DCFS involvement, and noted Mother often appeared with disheveled clothing and the previous night's smudged makeup.

On December 3, 2021, the CSW arrived at the home of Christian H., who identified himself as "the children's father." He shares his home with wife Elizabeth H., and readily invited the CSW to complete a home assessment. The CSW observed the home to be clean, with working utilities, and a well-stocked refrigerator and pantry. The children's bedroom was well-

furnished and "very child friendly" with separate sleeping quarters and many toys.

Christian H. stated he ended his relationship with Mother several years ago due to Mother's infidelity. While he is Peyton's biological father, he "considers himself to be the father to both child[ren]" as he is "the only dad Aliyah knows. I've always treated her like . . . one of my children. We love the girls and we'll do whatever it takes to make sure they're safe and have everything they need." He stated he "fear[s] losing a relationship with [Aliyah] because he is not her biological father, and [M]other often uses such circumstance as leverage against him as she repeatedly threatens to end their contact when confronted about her shortcomings as a parent."

He raised "long-standing concerns" about Mother, who he believes has "unresolved substance abuse issues related to alcohol and drug use." He previously called the police in 2020 because he refused to release the children to Mother, who attempted to pick them up while intoxicated. He raised these issues in Family Law Court. He has received phone calls from the children's school, requesting assistance from him because Mother forgets to pick them up. The children frequently tell him that Mother drinks and smokes with her male friends at her home.

On December 8, 2021, Mother informed the CSW she was no longer in agreement with the implemented safety plan and was unwilling to allow Christian H. to care for Aliyah because he is "attempting to take full custody." She stated she would no longer communicate with the CSW and would only speak to the CSW's supervisor.

6

The CSW contacted Elizabeth H., who explained that Mother was served with family law paperwork notifying her that Christian H. requested an emergency court hearing.

On December 8, 2021, the CSW arrived at Mother's home at 9:00 a.m. and encountered Mother and three adult males who appeared to be "drinking alcohol in the early hours of the morning" and were holding open beer cans. Mother refused to identify the males. The home remained disorderly with piled dirty dishes and gnats. The CSW interviewed the upstairs neighbor who confirmed drinking parties held at Mother's residence and often overheard Mother "yelling/cursing at her children telling them to 'go to fucken bed' at 10am."

On December 13, 2021, the CSW made an unannounced visit at Mother's home and found Aliyah home alone with two other children; Peyton was at Christian H.'s home. The CSW assisted Aliyah in getting prepared to be picked up by Christian H. Aliyah appeared "happy" to see him. She was removed from Mother's care and placed in Christian H.'s temporary care.

B.    *Petition and Detention*

On December 15, 2021, DCFS filed a Welfare and Institutions Code[1] section 300 petition on behalf of seven-year-old Aliyah and her five-year-old sister Peyton. The petition alleged the following:

Count b-1: Mother has "a history of substance abuse" and is "a current abuser of alcohol," rendering her incapable of providing regular care of her children. On prior occasions, Mother was under the influence of alcohol while the children

_____

[1]    Undesignated statutory references are to the Welfare and Institutions Code.

7

were in her care and supervision. Mother's substance abuse "interferes with providing regular care and supervision" of the children who are "of such a young age requiring constant care and supervision." Mother's substance abuse "endangers the children's physical health and safety" and places them at risk of serious physical harm, damage, and danger.

The petition identified Christian H. as Aliyah's "NREFM" (nonrelated extended family member) and as Peyton's "alleged" father. The petition also identified Levi C. as Aliyah's "alleged" father.

Mother filed her completed Parentage Questionnaire, stating a "paternity test [was] done" and results showed Levi C. is Aliyah's biological father. She stated he resides in Omaha, Nebraska.

Christian H. filed a "Statement Regarding Parentage" form JV-505, stating he believes he is Aliyah's parent and requested the juvenile court find that he is Aliyah's presumed father. He further provided that Aliyah has lived with him since her birth and he has held out the child as his own to family, friends, and coworkers. He has participated in Aliyah's childcare, doctor's visits, schooling, and has taken her on vacations and spent the holidays with her. He pays for her food and clothes. Christian H. "was the first to hold the child after she was born" and "is the only father the child has known." She refers to him as her "father." While he is "not the bio[logical] father, [he] has stood in the shoes of her father her whole life."

At the detention hearing on December 20, 2021, Mother and Christian H. appeared. The juvenile court inquired as to paternity and found Levi C. to be Aliyah's biological father and not her presumed father. The juvenile court found Christian H.

8

to be Peyton's presumed father. The court told Christian H., "You filed the JV-505. That's not good enough. [Aliyah] is seven years old, and Mom also is already saying someone else is [the biological father]." The court continued, "If [Christian H.] has some reason to believe that he should be named presumed as to . . . Aliyah, he's going to have to file something." Christian H. argued form JV-505 has stated enough to show he is the presumed father. The court reconsidered and stated, "At this point the children are with him. Both children are with him which is good news. Apparently he is a responsible adult for these kids and [Mother] is comfortable with them being there as well." The court decided to "defer[] any paternity findings. We can have two presumed fathers if it comes to that, and then the court will have to make a distinction as to which one will go forward."

The court found Aliyah is a person described by section 300. It found removal appropriate as there is "a substantial danger to [Aliyah's] physical and emotional health." The court gave DCFS discretion to place Aliyah with an appropriate relative or nonrelative extended family member. The court ordered monitored phone visits and in-person visits with the children. The court further ordered Mother to participate in a drug and alcohol treatment program and submit to regular testing; the court cautioned Mother, "You're going to get clean and sober or [Christian H.] is going to raise your kids."

C. *DCFS Investigation*

DCFS verified Mother's criminal history. On December 21, 2019, Mother was arrested on charges of Vehicle Code section 23152, subdivisions (A) and (B) for driving under the influence of alcohol/drugs. On August 16, 2021, Mother failed to appear

9

without sufficient excuse and a bench warrant was ordered in the amount of $15,000.

According to Department of Child Support Services (DCSS) records, a judgment regarding parental obligations was entered on June 3, 2016. Per the judgment, Mother and Levi C. are identified as Aliyah's parents, and Levi C. was ordered to pay monthly child support in the amount of $293. In addition, a stipulated judgment was filed on March 28, 2019, wherein Christian H. stipulated to pay guideline child support in the amount of $350 per month for Peyton.

On January 24, 2022, Mother's drug screening test came back positive for amphetamines, methamphetamines, and cocaine.

On February 11, 2022, Levi C. was located in Omaha, Nebraska. He is currently 25 years old and works at a cable company. He told the CSW that he has had "a handful of FaceTime calls" with Aliyah "over the years" but did not have regular calls because Mother did not make her available. "She kept my daughter from me." He stated he did not sign papers establishing paternity at the hospital because Mother "ran off to California while she was pregnant." When asked if he offered to pay child support, he stated, "I told [Mother] to file for child support." He "bought toys on Christmas, gifts on birthday. I've always tried." He stated a paternity test has not been done, but he believes the child is his because she "bears a resemblance" to him and has his curly hair. He never sought a declaration of paternity from any court. He thinks it is "messed up" that Aliyah thinks of Christian H. as her daddy and calls him "dad."

The dependency investigator (DI) interviewed Aliyah about her relationship with Levi C. She confirmed having FaceTime calls with him, at which time she showed him her toys. She had "two dads – her daddy Christian, who was her 'step-dad' and her daddy Levi." When asked whether she felt safe with Levi C., she replied, "I don't know" because she had "never lived with him." However, she said she would live with Levi C.; when asked why, she replied, "Because." The DI commented "[g]iven the child's young age, it is unclear if the child understands that he lives out of state and that her contact with her sister, mother, and [Christian H.] would become limited due to the far distance."

The DI interviewed Mother, who reported Levi C. was not listed on Aliyah's birth certificate as he was in Nebraska during the birth in California. She said Levi C. denied being Aliyah's father for the first three years of her life. When she filed for child support, he refused to pay unless a paternity test was done; a DNA test confirmed he was Aliyah's father. Levi C. has been paying child support "on and off." He has "never met the child in person" but they have had FaceTime calls. She said Aliyah has "two dads" and Aliyah refers to Levi C. as her "dad Levi." When asked if she had any concerns about Aliyah possibly living with Levi C., she replied, "Over my dead body is my child going over there."

The DI interviewed Christian H., who stated he has neither met nor spoken with Levi C. He discovered Mother had introduced Aliyah to Levi C. "a few years ago" and stated he was "okay with that. He is her biological dad. But I've also raised her for the last seven to eight years."

11

Levi C. filed a form JV-505 stating he believes he is Aliyah's father. He has told "[a]ll of [his] friends and family" that he is her father. He has had "video visits and phone calls with [Aliyah]" and has paid court-ordered child support "for over 6 years" in the amount of $85 per week. He was 18 years old when pregnant Mother "ran off to California."

## D. *Amended Petition*

On March 2, 2022, DCFS filed an amended petition on behalf of the children. In addition to the allegations already pleaded, it included added allegations: Mother is a current abuser of "alcohol, methamphetamines, and cocaine" which renders her incapable of providing regular care. On February 8, 2022, Mother had "a positive toxicology for cocaine" and on January 24, 2022, she had "a positive toxicology for methamphetamines and cocaine." Her substance abuse endangers the children's health and safety and places them at risk of serious harm.

## E. *Jurisdiction and Disposition*

In anticipation of adjudication, DCFS submitted an Addendum Report and a Last Minute Information (LMI) advising the juvenile court of the following. Mother had missed approximately half of her visits with the children and had arrived late to or left an hour early from the visits she did attend. DCFS recommended that a home assessment and background check on Levi C.'s household take place. Nebraska's Child Protective Services indicated they require an ICPC (Interstate Compact of the Placement of Children) request in order to initiate a home assessment and complete criminal background checks. DCFS recommended that an ICPC be initiated for Levi C. and his household. "If the ICPC is approved for [Levi C.], DCFS

12

respectfully recommends that DCFS continue to supervise the case for 3–6 months to ensure the child's transition into her father's home."  In the past four years, Levi C. had spoken with Aliyah approximately 10 times.  DCFS set up weekly FaceTime calls between Aliyah and Levi C. to establish regular contact between them and facilitate bonding.

On March 14, 2022, the jurisdictional and dispositional hearing took place.  Levi C. "appear[ed] for the first time."

Aliyah's counsel "renew[ed] [her] request for a continuance" of the disposition based on a "couple of things.  One, I would like her therapist to testify and I've just started trying to reach her today and I have not been successful in reaching her. [¶] Secondly, I would . . . like my office to . . . arrange for a bonding study between the siblings. [¶] I would also like for the social worker to be able to interview Aliyah in a neutral location.  This is a very traumatic upsetting situation.  I would like for her to be able to be interviewed in more detail with respect to her sibling relationship, [and] for that interview to be disclosed or contained in an [LMI]. [¶] You know, we didn't find out until just a few days ago that [Levi C.] was requesting custody.  [Aliyah] didn't find out.  I didn't find out.  This is all new information and it is a big deal to send her out of state so I want to have as much information before the court as possible to determine, you know, whether or not there's detriment.  I mean, I'm arguing that there is."

Mother joined in Aliyah's counsel's request for a continuance.  DCFS stated it had no objection to a continuance and was "in favor" of a continuance to allow DCFS time "to visit the state of Nebraska and assess the [Levi C.'s] home in person and assess the other individuals in the household."

13

The juvenile court denied the request and found "there's no basis to further delay. [Levi C.] is not named in the allegations and there's clear case law that . . . dictates the requirements of what a court must do when there is a parent who is capable, ready, willing and able to take custody of their child, although a noncustodial parent, what the court must do in that situation. [¶] So I'm not going to grant the continuance. This need not be delayed any further."

The court proceeded to adjudication. The court sustained the amended petition and found count b-1 true by a preponderance of the evidence. It found Aliyah and Peyton are "children described by . . . section 300."

The court took testimony from Elizabeth H., Christian H., and Aliyah.

Elizabeth H. She has known Aliyah since 2017 when Aliyah was two and a half. Aliyah has lived with her and Christian H. full-time since December 2021. Prior to that, Aliyah stayed with them "half the time" and with Mother "half the time." It was "three and a half days each" per week minimum, but because of Mother's work schedule and going out, Aliyah would spend at least five days a week with them, "sometimes the whole week." They spend time with Aliyah and Peyton together as a family; they had "park days, . . . beach day[s] . . . food adventures." Aliyah and Peyton are "always together. . . . They've never been separated." They play volleyball together and play pretend restaurant or hair salon together at the house. They have "princess day[s]" together where they dress-up. They share a room together where Aliyah sleeps on the top bunk bed and Peyton the bottom. They are "best friends" and "do everything together." Ever since Aliyah learned she may have to

14

live with Levi C. in Nebraska, she cries a lot (at least once a day), has become "more frustrated" and has been "latching on to toys even more." She grabs onto Christian H. and Elizabeth H. and "doesn't want to let go." She tells them she "doesn't want to go."

Christian H. He initiated family law proceedings for both children. He tried to establish paternal rights for Aliyah, whom he views as his daughter "since birth." He "was the first person to hold her. I was helping the mother pick out names. And the name that she has is one that I picked." He has "supported her financially, emotionally. I've raised her. I've been helping her learn to read. Before that, walk, talk, eat, all the child developments." He provided Mother with financial assistance for rent, food, clothes for Aliyah. He helps Aliyah with homework. He described the relationship between Aliyah and Peyton as "inseparable."

Aliyah G. She currently lives with her "dad" and "sister" and "mom" (and pointed to Christian H., Elizabeth H., and Peyton sitting in the courtroom) because DCFS "took [her] away from Mommy's house." She plays with her sister a lot and shares a room with her. She would feel "sad" if she couldn't live with or see Peyton anymore. She does not want to move to and live in Nebraska with her dad Levi C. She feels "scared" to live with Levi C. because she has not met him in person. She does not want the court to order her to go to Nebraska. She talked to Levi C. only once when she was in the first grade.

Aliyah's counsel argued Christian H. has met the requirements to be considered a presumed father for Aliyah. Mother requested that Christian H. be declared legally presumed father of Aliyah; if the court "is inclined to find [Levi C.] a presumed father, [Mother] request[ed] that the court find that it

15

would be detrimental to [Aliyah] for the court not to find two presumed fathers." Christian H. argued that Levi C. did not meet his burden to be deemed Aliyah's presumed father and the evidence supports a finding of Christian H. being declared her presumed father. Levi C. argued that he should be the presumed father and Aliyah should be placed in his custody. DCFS argued the court should address the issue of presumed father later, so that DCFS could "further investigate and also provide a recommendation with respect to that issue."

The juvenile court found DCFS made reasonable efforts to prevent removal but found it reasonable and necessary to remove Aliyah from Mother's care and custody.

"As it concerns the fathers, the court will apply the strict provisions of . . . [section] 361.2 and find that there are two parents that are ready, willing and able to have custody of their children." The court denied the request to declare Christian H. a presumed father under Family Code section 7612, subdivision (c). "That is not an appropriate thing to do and I think that is not fair to [Levi C.]. It's almost creating a *Kelsey S.*[2] situation where he doesn't even have the opportunity to see and have custody of his child." "I have no evidence here today to tell me that this child Aliyah would be psychologically and emotionally harmed if I were to not declare [Christian H.] as her presumed father." "There's no evidence to indicate that this child is going to go into a psychological tailspin, even though she may cry because she will miss Peyton and [Christian H.] and his wife, which is a common natural emotion when you're not seeing someone regularly, you miss them." "[T]here's no evidence here today to say that this

---

[2] *Adoption of Kelsey S.* (1992) 1 Cal.4th 816, 829–830, 849 (*Kelsey S.*)

16

child is going to have a severe mental breakdown or that it's going to be a psychologically traumatic event if [Christian H.] is not declared the presumed father."

The juvenile court found Levi C. the "presumed father" of Aliyah and found "there's no detriment in this court's eyes to declaring him a presumed father and ordering this child released" to him. "Although the court has the authority to issue the ICPC, there is no basis to do so. [DCFS] has been able to speak with [Levi C., who] has been forthright." "Over DCFS'[s] objection, [Aliyah was] placed in Home of Father [Levi C.] under supervision of DCFS." DCFS was ordered to secure a one-way airline ticket for Aliyah to go to Levi C. in Nebraska on March 21, 2022.

The next day, minor Aliyah filed a notice of appeal.

## DISCUSSION[3]

Appellant minor Aliyah G. contends the juvenile court violated her due process rights by "denying her reasonable request for a continuance after a showing of good cause." She further argues the juvenile court erred by failing to find Christian H. a presumed father under Family Code section 7611. She also argues the court erred by finding Levi C. to be her presumed father, as there is a lack of substantial evidence in support.

---

[3]     On March 18, 2022, Aliyah's counsel filed a Petition for Writ of Supersedeas, seeking a stay of the juvenile court's March 14, 2022 order that Aliyah be moved to Nebraska to live with Levi C. We issued a temporary stay of the juvenile court's order and, following oral argument, issued a permanent stay on June 30, 2022 pending resolution of this appeal.

A.	***The Juvenile Court Abused its Discretion When It Denied Minor's Request for a Continuance.***

1.	Applicable Law and Standard of Review

Section 352 governs continuances of dependency hearings. (See *In re M.F.* (2022) 74 Cal.App.5th 86, 102.)  Section 352, subdivision (a)(1) provides that upon the request of counsel for the minor, the court "may continue any hearing . . . beyond the time limit within which the hearing is otherwise required to be held, provided that a continuance shall not be granted that is contrary to the interest of the minor.  In considering the minor's interests, the court shall give substantial weight to a minor's need for prompt resolution of his or her custody status, the need to provide children with stable environments, and the damage to a minor of prolonged temporary placements." (§ 352, subd. (a)(1).)  Section 352, subdivision (a)(2) provides that continuances "shall be granted only upon a showing of good cause and only for that period of time shown to be necessary by the evidence presented at the hearing on the motion for the continuance." *Id.*, subd. (b).)

We review an order denying or granting a continuance for abuse of discretion.  (*In re Emily D.* (2015) 234 Cal.App.4th 438, 448; *In re B.C.* (2011) 192 Cal.App.4th 129, 143–144.)  To show abuse of discretion, appellant must demonstrate the juvenile court exercised its discretion in an arbitrary, capricious, or patently absurd manner, resulting in a miscarriage of justice. (*In re Emily D.*, at p. 448.)

2.	Analysis

Aliyah argues good cause supported her request for a continuance and the trial court's denial of her request resulted in an abuse of discretion and violated her due process rights.

18

We agree.

We preliminarily note that Christian H. joins in Aliyah's argument on appeal. Levi C. also concedes on appeal that the juvenile court erred in failing to continue the dispositional hearing as to Aliyah.

Aliyah has adequately shown that the denial of a continuance was contrary to her best interests. The record reveals Aliyah and her counsel discovered only "a few days" prior to the March 14, 2022 hearing that Levi C. intended to request custody of Aliyah. Minor's counsel explained to the court that she reached out to Aliyah's therapist, was unsuccessful in contacting her, and wanted to arrange for a bonding study between siblings and to determine whether the move to Nebraska would be detrimental to Aliyah. Minor's counsel should have been given the opportunity to adequately prepare and confer with the therapist and propound discovery regarding Levi C., who may or may not be suitable for placement. No home assessment was conducted; no background check on Levi C. or his household members was completed.

When denying the continuance request, the juvenile court repeated twice that it found "no basis to further delay." However, there had been no delay to begin with. This case was initiated in December 2021 and only three months had passed until the March 14, 2022 adjudication hearing; this was not a matter where years of hearings had taken place. Thus, a continuance was warranted to provide Aliyah and her counsel sufficient time to obtain relevant information as to whether placement of Aliyah with her out-of-state parent, whom she had never met in person, would be to her detriment. A continuance would not have otherwise delayed a prompt resolution of the matter.

19

The juvenile court also explained that "there's clear case law that . . . dictates the requirements of what a court must do when there is a parent who is capable, ready, willing and able to take custody of their child, although a noncustodial parent, what the court must do in that situation." However, the juvenile court was incorrect in its interpretation of the law. Section 361.2, subdivision (a) provides that when a court orders removal of a child, it "shall first determine whether there is a parent of the child, with whom the child was not residing at the time . . . , who desires to assume custody of the child. If that parent requests custody, the court shall place the child with the parent *unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child.*" (§ 361.2, subd. (a), italics added.)

Here, the continuance request was specifically to ascertain and/or obtain evidence relevant to section 361.2, that is, whether placing Aliyah with Levi C. would be detrimental to her safety, protection, or emotional/physical well-being. As the record provides, no home assessment was conducted and no background check on Levi C. or his household members were completed. DCFS had also recommended a continuance so that an ICPC of Levi's home could be conducted. As Aliyah and her counsel had only learned of Levi C.'s request for custody a mere few days prior, the juvenile court's denial of a continuance precluded them from obtaining relevant evidence to show whether the move would be to Aliyah's detriment. This was an abuse of discretion.

Aliyah has also adequately shown she was prejudiced by the court's decision to deny the continuance request. A "fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated,

20

under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." (*Mullane v. Central Hanover Bank & Trust Co.* (1950) 339 U.S. 306, 314.) The notice must be of such nature to "afford a reasonable time" for those interested to adequately make their appearance and raise their concerns. (*Ibid.*)

The juvenile court relied on the *absence* of evidence in making its findings and placement order. The court stated on the record: "I have no evidence here today to tell me that this child Aliyah would be psychologically and emotionally harmed if I were to not declare [Christian H.] as her presumed father." "There's no evidence to indicate that this child is going to go into a psychological tailspin, even though she may cry because she will miss Peyton and [Christian H.] and his wife." Essentially, the juvenile court denied Aliyah's continuance request to obtain relevant evidence, and then relied on the absence of evidence as the basis for its findings and orders.

We reverse the juvenile court's denial of Aliyah's request for a continuance.

B.  ***Paternity Findings***

We will first recite the applicable law as to paternity determinations and presumed father declarations, before addressing the arguments about the juvenile court's findings as to Levi C. and Christian H.

1.  Applicable Law and Standard of Review

The Uniform Parentage Act (UPA) (Fam. Code, § 7600 et seq.) "provides the framework by which California courts make paternity determinations. ([Fam. Code,] § 7610, subd. (b).)" (*Dawn D. v. Superior Court* (1998) 17 Cal.4th 932, 937.) Section

21

7611 sets forth various rebuttable presumptions for determining a child's natural parent. (*Dawn D.*, at p. 937.) A presumption under Family Code section 7611 generally "is a rebuttable presumption affecting the burden of proof and may be rebutted . . . only by clear and convincing evidence." (Fam. Code, § 7612, subd. (a).) "A person who claims entitlement to presumed parent status has the burden of establishing by a preponderance of the evidence the facts supporting the entitlement." (*R.M. v. T.A.* (2015) 233 Cal.App.4th 760, 774 (*R.M.*).)

Under Family Code section 7611, subdivision (d), a person may qualify as a presumed parent if he or she "receives the child into [his or her] home and openly holds out the child as [his or her] natural child." (Fam. Code, § 7611, subd. (d).) *R.M.* stated: "When determining whether the person has met the statutory requirements of receiving the child into his or her home and openly holding the child out as his or her own, the court may consider a wide variety of factors, including the person's provision of physical and/or financial support for the child, efforts to place the person's name on the birth certificate, efforts to seek legal custody, and the breadth and unequivocal nature of the person's acknowledgement of the child as his or her own. [Citation.] No single factor is determinative; rather, the court may consider all the circumstances when deciding whether the person demonstrated a parental relationship by holding out the child as his or her own and assuming responsibility for the child by receiving the child into his or her home." (*R.M.*, *supra*, 233 Cal.App.4th at p. 774.) Furthermore, "[b]iological fatherhood does not, in and of itself, qualify a man for presumed father status under section 7611." (*In re J.L.* (2008) 159 Cal.App.4th 1010, 1018, superseded by statute on other grounds as stated in

22

*In re Alexander P.* (2016) 4 Cal.App.5th 475, 486.) "[T]he core issues are the person's established relationship with and demonstrated commitment to the child." (*In re M.R.* (2017) 7 Cal.App.5th 886, 898.) "Presumed parent status is afforded only to a person with a fully developed parental relationship with the child." (*R.M.*, at p. 776, italics omitted.) The presumed father's commitment to the child is a key consideration. (*In re Sarah C.* (1992) 8 Cal.App.4th 964, 972.)

Although more than one individual may fulfill the criteria that give rise to a presumption of paternity, as a general rule, there can be only one presumed father. (*In re Kiana A.* (2001) 93 Cal.App.4th 1109, 1115.) Where the evidence shows that more than one man qualifies as a presumptive father, Family Code section 7612, subdivision (b) directs the trial court to weigh the competing presumptions. It states: "If two or more presumptions arise under [Family Code] [s]ection 7611 that conflict with each other . . . the presumption that on the facts is founded on the weightier considerations of policy and logic controls." (Fam. Code, § 7612, subd. (b).)

Effective January 1, 2014, Family Code section 7612 was amended to add new subdivision (c), which allows for the designation of a third parent for a child in an appropriate case. Family Code section 7612, subdivision (c) provides: "[A] court may find that more than two persons with a claim to parentage under this division are parents if the court finds that recognizing only two parents would be detrimental to the child. In determining detriment to the child, the court shall consider all relevant factors, including, but not limited to, the harm of removing the child from a stable placement with a parent who has fulfilled the child's physical needs and the child's

23

psychological needs for care and affection, and who has assumed that role for a substantial period of time. A finding of detriment to the child does not require a finding of unfitness of any of the parents or persons with a claim to parentage." (Fam. Code, § 7612, subd. (c).) In enacting Family Code section 7612, subdivision (c), the Legislature expressed its intent that it "only apply in the rare case where a child truly has more than two parents, and a finding that a child has more than two parents is necessary to protect the child from the detriment of being separated from one of his or her parents." (Stats. 2013, ch. 564, § 1.)

Finally, there is a biological father. "A biological or natural father is one whose biological paternity has been established, but who has not achieved presumed father status . . . . A man who may be the father of a child, but whose biological paternity has not been established, or, in the alternative, has not achieved presumed father status, is an 'alleged' father." (*In re Zacharia D.* (1993) 6 Cal.4th 435, 449, fn. 15.) "[O]nly a presumed, not a mere biological, father is a 'parent' entitled to receive reunification services." (*Id*. at p. 451; *In re Sarah C*., *supra*, 8 Cal.App.4th at pp. 974–975.)

On appeal, we independently interpret statutes and apply the substantial evidence standard in reviewing a juvenile court's finding whether a person is a presumed parent. (*In re L.L.* (2017) 13 Cal.App.5th 1302, 1310.)

2.    Analysis as to Levi C.

Aliyah argues the juvenile court erred in finding Levi C. a presumed father under Family Code section 7611. She argues the record in this case indicates Levi C. made minimal to no efforts to find or support Aliyah after Mother became pregnant.

24

She argues that Levi C. "did not support [M]other before the move and did not make active efforts to locate or initially support Aliyah afterwards. Because he was able to have phone visits with Aliyah, it is clear he knew exactly where she was." He "never tried to seek court intervention in Nebraska or in California [for] seven long years."

Christian H. argues Levi C. cannot be Aliyah's presumed father because Levi C. failed to make a full and prompt commitment to his parental responsibilities. (*Kelsey S.*, *supra*, 1 Cal.4th at pp. 829–830, 849; *In re Spencer W.* (1996) 48 Cal.App.4th 1647, 1654–1655; *In re Sarah C.*, *supra*, 8 Cal.App.4th at pp. 972–973.) Christian H. asserts that merely purchasing gifts on birthdays and holidays and paying $85 per week in child support are insufficient to give rise to a presumption of paternity. Christian H. also argues Levi C. failed to take formal legal action to claim paternity and only began to pay child support after Mother initiated a child support action and procured a paternity test.

Levi C. argues substantial evidence supported a finding that he qualified for presumed father status under *Kelsey S.* In *Kelsey S.*, the child's biological father—not married to Mother—could not qualify as a presumptive father under Family Code section 7611, subdivision (d), because he was prevented by the Mother from receiving the child into his home and establishing a relationship with the child; nonetheless, he had parental rights worthy of protection where he had taken significant steps in the earliest stages of the child's life to fulfill a parental role and objected to Mother's decision to place the child for adoption. (*Kelsey S.*, *supra*, 1 Cal.4th at pp. 821, 849–851.) Thus, the child

could not be placed for adoption until the biological father had consented or been found unfit. (*Id*. at pp. 849–851.)

However, that case differs from the facts before us. The father in *Kelsey S.* filed an action in superior court two days after the child's birth, to establish his parental relationship with the child and obtain custody of the child; he objected to Mother's decision to put their child up for adoption "because he wanted to rear the child." (*Kelsey S.*, *supra*, 1 Cal.4th at pp. 821–822.) In contrast, here, Levi C. did not attempt for the seven years of Aliyah's life (until this instant dependency matter) to obtain custody of Aliyah. Nor did he attempt to meet Aliyah in person or avail himself of a flight to California to be introduced to his biological daughter. He had seven years to try and cement a relationship with Aliyah. He did not provide child support for her until Mother initiated child support proceedings and a support judgment was entered against him. In addition, contrary to Levi C.'s claim that he was deemed Aliyah's father via the DCSS judgment entered June 3, 2016, that was not a judgment of paternity and was, in fact, a child support judgment. Plus, despite Levi's C. knowledge of Aliyah's whereabouts at least as of 2016 when child support proceedings took place, there is nothing in the record that demonstrates he sought or initiated any court action to gain any custody of Aliyah or visitation rights to establish a parental relationship with her.

In reviewing the factors relevant to determining whether Levi C. has met the statutory requirements for presumed father status, we do not find substantial evidence supporting his "physical . . . support for the child, efforts to place the person's name on the birth certificate, efforts to seek legal custody, and the breadth and unequivocal nature of the person's

26

acknowledgement of the child as his or her own." (*R.M.*, *supra*, 233 Cal.App.4th at p. 774.) Because presumed parent status is afforded "only to a person with a *fully developed parental relationship* with the child" (*id.*, at p. 776), we find there is no substantial evidence in support of the juvenile court's finding that Levi C. qualifies as Aliyah's presumed father, even under *Kelsey S.*

In making its finding that Levi C. is a presumed father, the juvenile court further found "there's no detriment in this court's eyes to declaring him a presumed father" and ordered Aliyah released to him. As mentioned above, the court erred when it did not allow a continuance for Aliyah's counsel to obtain evidence as to whether the child's placement with Levi C. would be to her detriment per section 361.2. We reverse and remand to the juvenile court to revisit this issue after Aliyah's counsel is given a continuance to obtain the necessary, relevant information. A remand is further warranted to allow the juvenile court to take evidence of what has occurred in Aliyah's life since our June 30, 2022 issuance of a permanent stay of the court's March 14, 2022 order.

### 3. Analysis as to Christian H.

Both Aliyah and Christian H. contend on appeal that the juvenile court erred in denying Christian H. presumed father status.

Levi C. does not contend on appeal that Christian H. fails to qualify as a presumed father under Family Code section 7611. Instead, he argues Christian H. failed to show below that he qualified as a "third parent" per Family Code section 7612, subdivision (c), and recites the juvenile court's finding on the issue, where it found: "I have no evidence here today to tell me

27

that this child Aliyah would be psychologically and emotionally harmed if I were to not declare [Christian H.] as her presumed father." However, as set out above, we have now concluded that the juvenile court's denial of the continuance request is the reason there is no evidence on this very issue—i.e., whether it is to Aliyah's detriment—which resulted in prejudicial error.

The record is replete with evidence that demonstrates a rebuttable presumption that Christian H. is Aliyah's presumed father under Family Code section 7611, subdivision (d). Christian H. was present at Aliyah's birth, chose her name, took her into his home, held her out as his child, provided necessities of life and acted toward her as a parent, helping with her homework, spending at least half of the week, if not more, with her, and spending holidays and vacations with her. Christian H. attempted to establish paternity of Aliyah by initiating a family law case. This is unequivocal evidence showing he openly acknowledged the child and provided financial support for the child since her birth. (See *Neil S. v. Mary L.* (2011) 199 Cal.App.4th 240, 248–249 [" '[I]ncreasingly, over the last three decades, our courts have resolved paternity disputes by looking to the existence and nature of the social relationship between the putative father and the child.' [Citation.] We have given 'great weight' to these social relationships, holding the relationship of a man who has lived with a child and treated the child as his son or daughter ' " ' "is much more important, to the child at least, than a biological relationship of actual paternity." ' " ' "].)

Thus, the juvenile court's finding that Christian H. is not a presumed father is not supported by substantial evidence.

Moreover, a presumed father presumption under Family Code section 7611, subdivision (d) arises if there is a preponderance of evidence in support of it. The evidence recited above qualifies as more than a preponderance of evidence. It may thus be rebutted only upon a showing of clear and convincing evidence. We find no clear and convincing evidence to the contrary, and Levi C. points to none on appeal.

## DISPOSITION

We reverse the juvenile court's dispositional order placing Aliyah with Levi C. and its order denying the continuance request. We remand with directions to allow a continuance for Aliyah's counsel to obtain relevant evidence/information from Aliyah's therapist as to whether the move to Nebraska is to Aliyah's detriment; prepare a sibling bond study as to Aliyah and Peyton (see *In re Luke M.* (2003) 107 Cal.App.4th 1412, 1425 [recognizing that "[s]ibling relationships are clearly a relevant consideration in evaluating a child's emotional well-being"]); and obtain a home assessment and background check as to Levi C. and his household.

We reverse the juvenile court's paternity findings that 1) Levi C. qualified as a *Kelsey S.* presumed father, and 2) Christian H. did not qualify as a presumed father. A remand is warranted to allow the juvenile court to hold further evidentiary proceedings as to paternity and to take evidence of what has occurred in Aliyah's life since our June 30, 2022 issuance of a permanent stay of the juvenile court's March 14, 2022 order. Further, given the foregoing and because the juvenile court had not undertaken the weighing process to resolve

29

competing paternity claims under Family Code section 7612, subdivision (b), it is necessary to remand the matter to the court to conduct a further evidentiary hearing and make related factual findings.  We also direct the juvenile court to visit the question of whether the third-parent exception applies under Family Code section 7612, subdivision (c).  (See *In re L.L.*, *supra*, 13 Cal.App.5th at p. 1318.)

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


STRATTON, P. J.

We concur:



GRIMES, J.



WILEY, J.